UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHRISTINA SACCOMANO,<br><br>Plaintiff,<br><br>v.<br><br>ANDREW SAUL,<br><br>Defendant. | Case No. 18-cv-02624-JCS<br><br>**ORDER RE MOTIONS FOR<br>SUMMARY JUDGMENT**<br><br>Re: Dkt. Nos. 20, 24 |

## I.     INTRODUCTION

Plaintiff Christina Saccomano brings this action appealing the final decision of Defendant Andrew Saul, Commissioner of Social Security (the "Commissioner"),[1] to deny Saccomano's application for disability benefits.  The parties have filed cross motions for summary judgment pursuant to Civil Local Rule 16-5.  For the reasons discussed below, Saccomano's motion is GRANTED, the Commissioner's motion is DENIED, and the matter is REMANDED to the Commissioner for an award of benefits.[2]

## II.     BACKGROUND

The parties' motions and ALJ's decision are primarily concerned with Saccomano's neck and shoulder injury and limitation of her right hand.  The Court's summary of the record focuses on those two issues as addressed by the parties and is therefore not intended to be a complete recitation of Saccomano's medical history.

---

[1] Andrew Saul was confirmed as Commissioner while this action was pending, and is therefore substituted as the defendant as a matter of law.  *See* 42 U.S.C. § 405(g); Fed. R. Civ. P. 25(d).

[2] The parties have consented to the jurisdiction of the undersigned magistrate judge for all purposes pursuant to 28 U.S.C. § 636(c).

### A. Saccomano's Medical Records

Christina Saccomano is a 57-year-old woman with a twelfth-grade education. Administrative Record ("AR," dkt. 15) at 82, 91. She worked as a produce clerk her entire adult life starting in 1984. *Id*. at 91. In 2005, Saccomano was involved in an all-terrain vehicle ("ATV") accident that resulted in an injury to her shoulder. *Id*. at 44. She had shoulder surgery three years later in 2008. *Id*. Before the surgery Saccomano reported that she "had an impingement" which meant she "could not raise [her] right arm over 90 degrees." *Id*. at 44–45. Saccomano underwent an MRI on April 29, 2009 after the surgery, which showed "multilevel degenerative changes with disk space narrowing and some facet arthritis." *Id*. at 294. After the surgery, her arm improved and Saccomano returned to work, but by October 2013 her arm pain had returned, accompanied by shoulder pain. *Id*. at 45–46. Saccomano stopped working as a produce clerk for Safeway because of the pain. *Id*. at 45. She alleges an onset date of October 8, 2013 for her disability. *Id*. at 164. She "ha[s] not worked in any capacity since" that date. *Id*.

Before she stopped working, Saccomano sought treatment to manage her pain. Dr. Richard Kidd treated her pain with physical therapy but noted minimal progress. *Id*. at 270–83. On May 28, 2013, Dr. James Carter reported that an x-ray of the limited cervical area of Saccomano's spine indicated that she suffered from degenerative spondylolisthesis at discs C3 and C4, flattening of the mid to lower cervical curve of the spine, degenerative disk disease at C4/C5, C5/C6, and C6/C7, and facet arthrosis at C2/C3, C3/C4, and C4/C5. *Id*. at 269. Dr. Carter also noted "[a]nterior weight bearing . . . which has been associated with increased biomedical stress at the cervicalthoracic junction." *Id*. He noted that Saccomano's "[a]nterior soft tissue markings appear within normal limits." *Id*. Saccomano continued receiving heat, massage, and physical therapy, but Dr. Kidd described her progress as "stalled," "minimal," or "minimal to fair." *Id*. at 272–79.

On August 5, 2013, Saccomano underwent an electromyography ("EMG") test with Dr. Maliheh Massih. AR 318–20. The test "reveal[ed] evidence of moderate acute C6 radiculopathy on the right, [but] there was no evidence of focal or diffuse neuropathy." *Id*. at 320. Dr. Massih cautioned that "conventional EMG and nerve condition studies cannot test small sensory fibers

1  which, when relatively irritated, may underlie pain and paresthesias arising from within 'named'

2  peripheral nerves, soft tissues, bony structures, and sensory roots." *Id.*

3         Dr. Wendy Flapan evaluated Saccomano at the Stanford Hospital Spine Clinic on June 5,

4  2013, and reported her findings to Dr. Cathy Joseph, also at Stanford Hospital. *Id.* at 284–86. Dr.

5  Flapan suggested that Saccomano "may have some ongoing spondylosis that are causing her

6  pain." *Id.* at 285. While Dr. Flapan did "not believe that it was necessary at this time to

7  investigate the right shoulder," she felt that Saccomano "may have some symptomology

8  emanating from within the shoulder." *Id.* Dr. Flapan further noted that Saccomano's Spurling's

9  test[3] was negative, that her shoulder range of motion was full, and that provocative maneuvers of

10  the right shoulder were negative. *Id.*

11        Saccomano received cervical epidural steroid injections on September 11, 2013 and

12  October 22, 2013. *Id.* at 334, 341. Dr. Gang Li, Saccomano's treating physician, resorted to

13  injections because Saccomano "ha[d] tried conservative medical and physical therapies without

14  significant improvement of the pain." *Id.* at 341. Saccomano reported that injections helped but

15  that the pain returned. *Id.* at 351. Dr. Li's treatment notes consistently indicated a positive

16  Spurling's test, a "guarded range of motion in flexion, extension, lateral rotation and lateral

17  bending with an increase in pain with bilat lateral rotation over the (R) para-spinal muscles," and

18  the ineffectiveness of other treatment measures, including epidural injections. *Id.* at 334–40. His

19  colleague at the Comprehensive Pain Management Center, Clark J. Bishop, PA, reported similar

20  findings, including a positive Spurling's test and decreased sensation at the C6/7 dermatomes. *Id.*

21  at 332. Dr. Li reported that while Saccomano was not taking Naproxen consistently, "[t]he patient

22  continues on stable dose of medications in a responsible and compliant fashion." *Id.* at 351–52.

23        On January 28, 2014, Dr. Edward Rustamzadeh noted that Saccomano complained of pain

24  in her right arm accompanied by "intermittent numbness and tingling." *Id.* at 297. He viewed

25

26  [3] "Physicians conduct a Spurling's test to assess nerve root compression and cervical radiculopathy by turning the patient's head and applying downward pressure. A positive
27  Spurling's sign indicates that the neck pain radiates to the area of the body connected to the affected nerve." *Shaw v. AT & T Umbrella Ben. Plan No. 1*, 795 F.3d 538 n.1 (6th Cir. 2015)
28  (*citing* Spurling's Test, Physiopedia.com, http://www.physiopedia.com/Spurling's_Test (last visited July 12, 2015)).

Saccomano's 2009 post-surgery MRI and concluded that it "showed some mild degenerative disk disease" but "no significant foraminal stenosis on the right to explain any of her radicular symptoms." *Id*. at 298. Doctors were divided as to the cause of her symptoms. Dr. Rustamzadeh wrote: "I cannot explain [the EMG results] on the imaging, nor can I explain it in clinical findings." *Id*. He opined that the cause of her pain was "most likely . . . shoulder arthropathy." *Id*.

On February 6, 2014, Dr. Zackary Vaughn examined the 2013 x-rays and concluded that they "do not demonstrate any significant abnormal findings [but] they do demonstrate the previous distal clavicle excision with a small area of calcification in the area of the remaining AC joint." *Id*. at 305. He opined that the source of Saccomano's pain was not her shoulder but her spine, and that her pain "may represent a variant of thoracic outlet syndrome." *Id*. Dr. Matthew Smuck reviewed the same images on March 12 and concluded that "[f]our views of the right shoulder demonstrate no acute fracture or dislocation. Mild degenerative change of the acromioclavicular joint, with resportion of the distal clavicle . . . . concerning for osteolysis." *Id*. at 311.

Saccomano had a hysterectomy in October of 2014, which led to a cardiac event that doctors diagnosed as Takotsubo Syndrome. *Id*. at 517. She stayed in the hospital and received cardiac treatment. *Id*. at 968; *see also id*. at 393–973 (full treatment records from Good Samaritan Hospital).

Dr. Massih repeated the EMG test on November 24, 2014, which she compared to the 2009 MRI. *Id*. at 975. She found "[r]ight C6 and possibly C7 subacute . . . MRI is not correlating, consider repeat [sic] the MRI. This test was done extensively and there is definitly [sic] impingement on the Right C6 and possible C7 as well[.]" *Id*.

Dr. Li completed his first Physician's Medical Source Statement on April 21, 2014. *Id*. at 312–16. He listed Saccomano's diagnoses as "neck pain, cervical DDD & radiculopathy, myofascial pain, [and] shoulder pain." *Id*. at 312. He also indicated that Saccomano experienced tenderness, muscle weakness, impaired sleep, motor loss, reduced grip strength, significant limitation of motion, easy distractibility, decreased energy, sleep disturbance, and difficulty with concentration. *Id*. at 312–13. When asked "[h]ow often during a typical workday is your patient's

experience of pain severe enough to interfere with **ATTENTION and CONCENTRATION** needed to perform even simple work tasks?" he replied "constantly," which translates to over 66% of an eight-hour workday. *Id*. at 313 (emphasis in original). While he opined that Saccomano had no functional limitations in walking city blocks, he noted that she could not sit "in a *competitive work situation*" for longer than thirty minutes, could not stand for longer than twenty minutes, and would be limited to two hours of sitting, standing, and walking within an eight-hour work day. *Id*. at 314 (emphasis in original). He estimated that Saccomano would need unscheduled breaks of about fifteen minutes every hour. *Id*. She could never lift more than ten pounds, climb ladders, or climb stairs; she could rarely lift less than ten pounds, turn her head to the right or left, or look up; she could only occasionally look down, hold her head in a static position, twist, stoop, or crouch/squat. *Id*. at 315. She would have significant limitations with reaching, handling, or fingering: her right side would only be able to handle or finger 30% of the day and she would never be able to use her right arm to reach. *Id*.

As part of her initial application, Saccomano underwent a telephonic examination at a Social Security Administration field office on May 10, 2014. *Id*. at 180–82. Her interviewer found that she had no trouble concentrating. *Id*. at 181. Saccomano was examined by Dr. Jonathan Nordlicht on September 16, 2014. *Id*. at 72. He noted that her medically determinable impairments could responsibly be expected to produce Saccomano's pain, but that objective medical evidence alone couldn't account for the severity of her symptoms. *Id*. at 75–76. He found that she had exertional limitations, *id*. at 76, and that, while her "reaching in any direction" was limited, she was "unlimited" in handling, fingering, and feeling. *Id*. at 77. Dr. Nordlicht found Saccomano "Not Disabled," *id*. at 79, and determined that her Residual Functioning Capacity ("RFC") was suitable for "light work." *Id*. at 78. On October 31, 2014, Saccomano underwent a second disability report as part of her request for reconsideration. Dr. J. R. Saphir, another consultative physician, examined Saccomano and concluded that she could occasionally lift twenty pounds, frequently lift ten pounds, and stand, sit, or walk for six hours in an eight-hour work day. *Id*. at 89. He adopted Dr. Nordlicht's RFC "as is." *Id*. at 90.

After her request for reconsideration was returned unfavorably, Saccomano submitted an

appeal on October 31, 2014.  *Id.* at 211–17.  She listed medications Naproxen, Gabapentin, and

Norco; she indicated that the second two produced side effects of "drowsiness [and] hard to

concentrate."  *Id.* at 213.  She noted that her daily activities had not changed since the disability

report that accompanied her initial application and she "still [had] to limit activities, move much

slower, and take numerous breaks due to pain."  *Id.* at 214.

Saccomano underwent another MRI on March 16, 2015, which revealed a small anterior

annular fissure "new since the prior study," mild posterior disc osteophyte complex on C5-C6 and

C6-C7, and an unchanged right thyroid cystic nodule of about 5 millimeters.  *Id.* at 979–80.[4]

On April 6, 2015, Saccomano was examined by Dr. Calvin Pon, a consultative examining

physician.  Many of his conclusions conflicted with Dr. Li's:

> She should be able to sit for a total of six hours during an eight-hour
> work day . . . [S]he should still be able to perform pushing/pulling
> right arm/hand control occasionally to frequently . . . She should be
> able to lift and carry frequently 10 pounds and occasionally up to 20
> pounds with most of the lifting and carrying performed by her left
> upper extremity because of her complaint of right shoulder pain and
> right upper extremity numbness . . . . There is no limitation in her
> ability to perform gross and fine manipulative tasks with her left hand.
> In spite of her complaint of right thumb and index finger numbness,
> there is no functional impairment in her ability to perform gross and
> fine manipulative tasks with the right hand; however, there may be
> some symptomatic limitations.

*Id.* at 391.  Dr. Pon's Spurling's test was negative.  His examination of Saccomano's upper

extremities revealed that she "was able to forward flex and abduct her right shoulder to

approximately 130 degrees, limited by neck and shoulder pain."  *Id.* at 389–90.  She could make a

fist normally with both hands, her grip strength was 5/5 in both hands, and manual motor muscle

testing indicated that her right shoulder resistance was "3+ to 4-/5."  *Id.* at 390.

Dr. Li filled out his second medical source statement on November 9, 2016.  Saccomano's

pain had slightly improved: he estimated that she could now "occasionally" lift less than ten

pounds and "rarely" lift ten pounds.  *Id.* at 982.  He also noted that that Saccomano's pain and

other symptoms would now only "occasionally" interfere with her attention and concentration.  *Id.*

---

[4] The report for this MRI indicates that a June 20, 2013 MRI was used as a comparison.  AR at 979.

She would still need unscheduled breaks every hour and would still be absent from work more than four days per month. *Id*. at 983. He estimated that her "feeling" abilities would be limited to three hours per day in an eight-hour work day and that her reaching, handling, and fingering abilities would be limited to thirty minutes. *Id*.

### B. Initial Denial of Application

Saccomano filed a Title II application for Social Security Disability Insurance Benefits on April 21, 2014. AR at 165. She alleged an onset date of October 8, 2013. *Id*. She listed the following as the medical conditions causing the pain that prevented her from working: (1) "Cervical DDD"; (2) "Shoulder radicular pain"; (3) "Cervical Feacte disease, bulging discs"; (4) "Right arm pain"; and (5) "Myofascial pain." *Id*. at 184. Her initial application was denied on September 11, 2014 because the Commissioner found Saccomano was still capable of doing work that was less strenuous than her previous job. *Id*. at 79. Saccomano filed for reconsideration. That, too, was denied on May 18, 2015, when the Commissioner again found that Saccomano was "able to perform work that is less demanding" than her past work. *Id*. at 92. Saccomano then filed a request for a hearing by an administrative law judge on August 13, 2015. *Id*. at 111. While her request was untimely, the Commissioner found there was good cause to excuse her late filing under 20 C.F.R. § 404.8911(b) because neither Saccomano nor her representative received notice that her request for reconsideration had been denied. *Id*. at 111–12. Saccomano did not submit any additional evidence. *Id*. at 112.

### C. Administrative Hearing

Administrative Law Judge Robert Freedman (the "ALJ") held a hearing on November 17, 2016. The ALJ first asked Saccomano why her earnings statement listed her as employed through October of 2014 while her alleged date of onset was October of 2013. *Id*. at 41. She explained that her earning statement represented income from state disability benefits, sick leave, and vacation benefits. *Id*. at 41–42. The ALJ prompted Saccomano to describe her job as a produce clerk at Safeway, which she held until her alleged date of onset in October 2013. *Id*. at 42. Saccomano replied that her responsibilities included "writing orders on the manager's days off, stocking shelves, off stacking pallets, [and] ordering." *Id*. She testified that around an hour and a

half of her work day was spent tracking inventory and the rest was spent "stocking [and] unloading pallets." *Id*. at 43. The heaviest thing she lifted was fifty pounds. *Id*. at 59. She only performed cashier work occasionally "when the front end would get busy." *Id*. at 43.

The ALJ then asked about Saccomano's ATV injury. *Id*. at 44. Saccomano testified that the 2005 injury lead to her 2008 surgery to repair "an impingement" that meant she could "not raise her right arm over 90 degrees." *Id*. at 44–45. Saccomano recounted the history of her pain, which she testified improved after her 2008 surgery but "gradually" returned to her neck. *Id*. at 45. Even though she "moved to a different store and they didn't have [her] lifting as much," Saccomano said she stopped working in 2013. *Id*. at 45–46. When the ALJ asked why she stopped working, Saccomano replied "I was in so much pain I couldn't do my job." *Id*. at 46. The ALJ asked Saccomano how she was managing the pain. Saccomano replied that she was using "medication, heat, and . . . stretching." *Id*. at 49.

The ALJ inquired about Saccomano's daily routine. *Id*. at 50. According to Saccomano, she cooks for herself and her husband and performs "small amounts" of household chores, such as light vacuuming for five to ten minutes interspersed with fifteen- to twenty-minute breaks. *Id*. at 51. Saccomano further testified that she drives "every day, around town . . . [to the] grocery store, yoga, maybe out to lunch." *Id*. at 52. At the grocery store, Saccomano only purchases "small amounts" totaling "two, three pounds" per bag to avoid the bags being "too heavy" for her to carry. *Id*. She also testified that she participates in a restorative yoga class about four times per week as a substitute for physical therapy. *Id*. at 48. According to Saccomano's testimony, the class is an hour and fifteen minutes long and consists of "four or five positions throughout the hour class and you stay there for about five minutes . . . . So it's like a gentle long stretch." *Id*.

The ALJ confirmed that Saccomano's doctor "actually recommended . . . an active lifestyle and stay[ing] active." *Id*. at 53; *see also id*. at 336. Saccomano testified that, besides her restorative yoga class, the only other physical activity she regularly engages in is walking her two dogs. *Id*. at 53. She explained that she can no longer walk both the large and the medium-sized dog at the same time, so she walks each separately three times a week for three blocks each. *Id*. Saccomano explained that the walks each take about fifteen minutes, and that after half an hour of

walking she needed a twenty-minute break. *Id*. at 54. Her husband lifts the food bags for the dogs; the most Saccomano can lift is three pounds. *Id*.

Once the ALJ finished asking questions, Saccomano's attorney asked about Saccomano's level of pain. Saccomano testified that her pain level was an eight to a ten out of ten, or a four or five with medication. *Id*. at 56. The attorney asked whether the side effects of these medications led to "drowsiness, dizziness, and limited concentration," Saccomano replied that she experienced all three, which led her to "avoid driving or any substantial thing that [she needs] to be alert for." *Id*. In response to questions from her attorney, Saccomano testified that the drowsiness and other side effects made it difficult for her to concentrate, pay attention, and focus. *Id*. at 56–57. The drowsiness also drove her to take naps of about an hour during the week. *Id*. at 58.

The ALJ then turned his attention to Ronald Morrell, a sworn vocational expert. *Id*. at 59. The ALJ provided the following hypothetical:

> [A]ssume a hypothetical individual of the same age, educational background, and professional experience as the claimant. And please assume that this hypothetical individual subject to the following limitations. The exertional level of light with ladders, ropes, and scaffolds limited to a no more than occasional basis. . . . Please assume that reaching both lateral and overhead with the upper dominant extremity is limited to no more than occasional.

*Id*. at 61. The vocational exert testified that such a person would not be able to perform Saccomano's past work. *Id*. Such a person would, he opined, be able to perform assembly line work. *Id*. He identified three specific jobs that the individual in the hypothetical could perform: small products assembler, production assembler, and bench assembler. *Id*. at 61–62. The vocational expert testified that there are around 300,000 such jobs in the national economy. *Id*.

The ALJ and the vocational expert discussed Saccomano's inability to frequently reach laterally and overhead. *Id*. at 64. They confirmed that the RFC specified that Saccomano should only reach "occasionally," or for a third of her day. *Id*. The ALJ then posed a second hypothetical that considered the same individual discussed in the first hypothetical with the added limitation that "the standing duration is limited to no more than four hours." He asked, "[w]ould this eliminate or erode the positions that you described for us?" *Id*. at 65. The vocational expert

1   testified that it would not.  *Id*.

2         Saccomano's attorney then directed the vocational expert's attention to the *Dictionary of*

3   *Occupational Titles*' (the "DOT") and its companion, the *Selected Characteristics of Occupations*

4   (the "SCO"), description of the assembly jobs, which described the occupations as requiring

5   "frequent" reaching.  *Id*. at 66.  The vocational expert testified that, in his professional experience,

6   the reaching requirement was not frequent but occasional.  *Id*.  The last time the vocational expert

7   witnessed the jobs being performed was three or four years ago.  *Id*. at 67.  In response to

8   questioning by Saccomano's attorney, the vocational expert confirmed that he had not prepared a

9   report documenting these observations.  *Id*.  Saccomano's attorney then expanded on the ALJ's

10  second hypothetical by adding that the person would be limited to lifting and carrying no more

11  than ten pounds frequently and occasionally pushing and pulling. The vocational expert replied

12  that such a person would be able to perform jobs the DOT lists as sedentary based on the ten-

13  pound limitation.  *Id*. at 68.

14        Saccomano's attorney posed her own hypothetical: "If the person were to be off task let's

15  say 15 to 20 percent of an eight-hour day or work week due to symptoms related to chronic pain or

16  side effects of medication, would there be work for a person like that to do?"  *Id*. at 69.  The

17  vocational expert responded: "For my experience 15 percent is kind of the cut off.  So if it's any

18  greater than 15 percent the answer would be no."  *Id*.  Saccomano's attorney added: "[i]f in

19  addition to hypothetical number one, we change the reaching, handling, and fingering limitations

20  to 30 minutes each for each of those activities, feeling can be done at three hours . . . . would there

21  be any available work?"  *Id*.  The vocational expert responded: "There'd be no jobs."  *Id*.  He

22  further testified, in response to the attorney's question, that the maximum number of monthly

23  absences that a job would tolerate would be two.  *Id*. at 69–70.

24        **D.     Regulatory Framework for Determining Disability**

25        When a claimant alleges a disability and applies to receive Social Security benefits, the

26  ALJ evaluates the claim using a sequential five step process.  20 C.F.R. § 404.1520(a)(4).  At step

27  one, the ALJ determines whether the applicant is engaged in "substantial gainful activity."  20

28  C.F.R. § 404.1520(a)(4)(I).  Substantial gainful activity is "work activity that involves doing

significant physical or mental activities . . . that the claimant does for pay or profit." 20 C.F.R. § 220.141(a)–(b). If the claimant is engaging in such activities, the claimant is not disabled; if not, the evaluation continues at step two.

At step two, the ALJ considers whether the claimant has a severe and medically determinable impairment. Impairments are severe when "there is more than a minimal limitation in [the claimant's] ability to do basic work activities." 20 C.F.R. § 404.1520(c). If the claimant does not suffer from a severe impairment, she is not disabled; if she does have a severe impairment, the ALJ proceeds to step three.

At step three, the ALJ turns to the Social Security Administration's listing of severe impairments (the "Listing"). *See* 20 C.F.R. § 404, subpt. P, app. 1. If the claimant's alleged impairment meets one of the entries in the Listing, the claimant is disabled. If not, the ALJ moves to step four.

At step four, the ALJ assesses the claimant's residual functional capacity, or RCF, to assess whether the claimant could perform her past relevant work. 20 C.F.R. § 404.1520(a)(1). The RCF is a determination of "the most [the claimant] can do despite [the claimant's] limitations." 20 C.F.R. § 404.1520(a)(1). The ALJ considers past relevant work to be "work that [the claimant] has done within the past fifteen years, that was substantial gainful activity, and that lasted long enough for [the claimant] to learn how do to it." 20 C.F.R. § 404.11560(b)(1). If the claimant is able to perform past relevant work, she is not disabled; if she is not able to perform such past relevant work, the ALJ continues to step five. In the case of claimants who are fifty-five or older, are restricted to sedentary work, have no transferable skills, and have not completed any relevant vocational education, the Commissioner will usually not offer any evidence of work meeting the claimant's RFC and the ALJ will decide disability based on the claimant's ability to perform past work. 20 C.F.R. § 404, subpt. P, app. 2 § 201.00(d).

At the fifth and final step, the burden shifts from the claimant to prove disability to the Commissioner to "identify specific jobs existing in substantial numbers in the national economy that the claimant can perform despite her identified limitations." *Meanel v. Apfel*, 172 F.3d 111, 1114 (9th Cir. 1999). If the Commissioner meets that burden and presents specific jobs within the

claimant's RFC, the claimant is not disabled; if not, the claimant is disabled and entitled to benefits. 20 C.F.R. § 404.1520(g)(1).

### E. The ALJ's Decision

The ALJ first determined that Saccomano had not engaged in substantial gainful activity since her alleged onset date of October 13, 2013, and that she had the following severe impairments: "thoracic outlet syndrome; status post arthroscopic surgery to right shoulder; degenerative disc disease of the cervical spine; radiculopathy from the cervical spine affecting the right upper extremity; and degenerative spondylolisthesis in the cervical spine." AR at 20. The ALJ explained that Saccomano's impairments do not meet the criteria for a listing. *Id*. at 20 –21. The ALJ found that Saccomano "has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except ropes, ladders, and scaffolds are limited to no more than an occasional basis. Reaching both laterally and overhead with the upper dominant upper extremity is limited to no more than occasional." *Id*. at 21.

The ALJ explained the process he employed to consider Saccomano's symptoms. First, he found that "the medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence, and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." *Id*. at 22. Then, the ALJ continued:

> Although the objective medical evidence confirms the presence of chronic pain, the records contain no objective findings that corroborate her allegations of disabling functional limitations. Diagnostic imaging has been relatively benign with her providers noting no need for surgical intervention. The claimant's treatment course has been essentially conservative in nature consisting of some physical therapy and a few epidural steroid injections in September and October of 2013, but she has primarily been treated through medication management (Exhibit 7F, pgs 12, 25).

Ultimately, the ALJ was not convinced that Saccomano's report of her symptoms and limitations was credible:

> [A]lthough the claimant has alleged that her impairments prevent her from sustaining work in any capacity, the record of evidence establishes that she has substantially greater functional capacities. As

12

mentioned previously, the claimant's providers have recommended that she remain active and exercise with the claimants testifying to her attending a restorative yoga class since January of 2015 four times a week, for an hour and a half.[5] She testified to doing her household chores on a limited basis, but admitted to doing the dishes, vacuuming one room at a time for five to 10 minutes, shopping twice a week, and cooking for herself and her husband (completing all meals through the course of the day). She is able to drive and does so daily, with her driving to go grocery shopping a few times a week and driving to yoga. The claimant also reported her going out to lunch. She further testified that while she cannot walk dogs together, she walks one dog at a time, doing two dog walks, three times per week for about three blocks each. All these activities are inconsistent with the claimant's allegations and suggests the claimant has at least at times overstated her symptoms and limitations. These inconsistencies suggest that the information provided by the claimant generally may not be entirely reliable . . . . Overall, the claimant's daily activities combined with the minimal objective findings, conservative treatment course, and her doctor's recommendation of "staying active" and exercising is consistent with the finding that the claimant can perform light work.

*Id*. at 26.

The ALJ was likewise dismissive of Saccomano's treating physician Dr. Li's opinion:

Overall, the restrictions of Dr. Li are given little to no weight. There is no reasonable basis to support Dr. Li's broad limitations as to the claimant being unable to sit, stand, or walk a total of six hours in an eight-hour day, missed days, and the need for hourly breaks. Concentration and attention deficits are also unsupported as well as significant limitations regarding hand[ling], fingering, and feeling. Moreover, it seems rather questionable that on the same day Dr. Li completed his April 2014 opinion, his actual treatment records noted only the restrictions as to lifting, climbing, and prolonged sitting (Exhibit 7F, pg. 56). Additionally, as mentioned previously, Dr. Li's findings on physical examinations remained grossly unchanged with intervening specialist examinations showing contradictive findings and greater functional abilities.

*Id*. at 27. The ALJ instead relied on the findings of Dr. Pon, the consultative state agency examiner, who "opined the claimant to have no restriction in standing and/or walking, her able to sit for a total of six hours during an eight-hour workday, and her able to lift 20 pounds occasionally and 10 pounds frequently (Exhibit 11F)." *Id*. at 26.

The ALJ then considered the testimony of Ronald W. Morrell, the vocational expert. The vocational expert conceded that Saccomano could no longer work as a produce clerk but claimed

---

[5] This is a slight discrepancy as Saccomano testified that the restorative yoga class lasts for one hour and fifteen minutes. AR at 48.

that she could work as a small products assembler, production assembler, or a bench assembler, all of which are exertionally light and unskilled. *Id*. at 27–28. In making this finding, the ALJ accepted the vocational expert's testimony that "while the DOT shows these positions require frequent reaching, based on his professional experience and observation of the jobs they do not require more than occasional reaching." *Id*. at 29. Ultimately, the ALJ concluded that "considering the claimant's age, education, work experience and residual functional capacity, the claimant is capable of making a successful adjustment to other work that exists in significant numbers in the national economy." *Id*. The ALJ found Saccomano's RFC to be "[l]ight work as defined in 20 CFR 404.1567(b) except ropes, ladders, and scaffolds are limited to no more than an occasional basis. Reaching both laterally and overhead with the upper dominant extremity is limited to no more than occasional." *Id*. at 21. Based on his rejection of the testimony of Saccomano and her treating physician, and his assessment of the testimony of Dr. Pon and the vocational expert, the ALJ found Saccomano "not disabled." *Id*.

## F. The Parties' Arguments

Saccomano first argues that the ALJ erred as a matter of law in failing to credit the testimony of Dr. Li, Saccomano's treating physician, without providing clear and convincing reasons. Pl's Mot. (dkt. 20) at 12. She further argues that the ALJ improperly rejected her testimony at the administrative hearing, again not providing clear and convincing reasons for doing so. *Id*. at 14. Finally, Saccomano argues that the ALJ's Step 5 finding that she could work as a small products assembler, production assembler, or bench assembler was not supported by substantial evidence because the ALJ should not have relied on the vocational expert's testimony over the description of the jobs in the DOT. *Id*. at 15. Saccomano maintains that the proper remedy is remand for an award of benefits. *Id*. at 17–18.

The Commissioner argues that the ALJ did not err in disregarding Dr. Li's opinion because "the objective findings in the record did not [show] support for Plaintiff's claim of disability." Comm'r's Mot. (dtk. 24) at 5. The Commissioner contends that the ALJ's decision to weigh Dr. Pon and other consultative physicians' opinions over Dr. Li's opinion was supported by substantial evidence because "the medical consultants reviewed the record evidence and their

findings were both supported by and consistent with the record evidence." *Id*. at 8. The

Commissioner further asserts that the ALJ made sufficiently specific findings to justify

discrediting Saccomano's testimony about her subjective symptoms. *Id*. at 11. Lastly, the

Commissioner argues that the ALJ acted appropriately in questioning the vocational expert and in

relying on his testimony despite the contradictions with the DOT. *Id*. at 16–17. The

Commissioner asks that, should the Court find the ALJ committed legal error, the Court remand

for further administrative proceedings rather than for an award of benefits. *Id*. at 17–19.

      In response to the Commissioner's motion for summary judgment, Saccomano argues that

the ALJ erred because he failed to "explain how any of the objective findings or Dr. Li's treatment

notes *are actually inconsistent with the limitations he described*." Reply (dkt. 25) at 3 (emphasis

in original). While Saccomano concedes that the ALJ considered the correct factors in assessing

the consistency between Saccomano's testimony and the objective evidence in the record,

Saccomano contests the ALJ's finding that the two are inconsistent. *Id*. Saccomano again

contends that:

> the ALJ did not ask the vocational expert if the evidence he provided
> was consistent with the information provided in the DOT, and then,
> after the vocational expert directly stated that his testimony was
> contrary to the information in the DOT and the SCO, the ALJ did not
> attempt to elicit any explanation regarding the conflict between the
> ALJ's hypothetical question allowing for only occasional reaching,
> both laterally and overhead, and the vocational expert's identification
> of jobs listed as requiring frequent to constant reaching.

*Id*. at 7.

      Saccomano asserts that the ALJ not only erred in relying on the vocational expert's

testimony without articulating persuasive evidence for doing so, but also that the ALJ failed to

consider Saccomano's limitations regarding time missed and resting requirements. As a result,

"the VE's testimony that Saccomano can perform those occupations has no evidentiary value." *Id*.

at 7. Finally, Saccomano renews her request that the Court remand for payment of benefits

because remanding for further administrative proceedings would be "fruitless" and because all the

requirements of the Ninth Circuit's the "credit as true" rule are met. *Id*. at 8.

# III.    ANALYSIS

## A.    Legal Standard

District courts have jurisdiction to review the final decisions of the Commissioner and may affirm, modify, or reverse the Commissioner's decisions with or without remanding for further hearings.  42 U.S.C. § 405(g); *see also* 42 U.S.C. § 1383(c)(3).

When reviewing the Commissioner's decision, the Court takes as conclusive any findings of the Commissioner that are free of legal error and supported by "substantial evidence." Substantial evidence is "such evidence as a reasonable mind might accept as adequate to support a conclusion" and that is based on the entire record.  *Richardson v. Perales*, 402 U.S. 389, 401. (1971).  "'Substantial evidence' means more than a mere scintilla," *id.*, but "less than preponderance."  *Desrosiers v. Sec'y of Health & Human Servs.*, 846 F.2d 573, 576 (9th Cir. 1988) (citation omitted).  Even if the Commissioner's findings are supported by substantial evidence, the decision should be set aside if proper legal standards were not applied when weighing the evidence.  *Benitez v. Califano*, 573 F.2d 653, 655. (9th Cir. 1978) (quoting *Flake v. Gardner*, 399 F.2d 532, 540 (9th Cir. 1978)).  In reviewing the record, the Court must consider both the evidence that supports and the evidence that detracts from the Commissioner's conclusion.  *Smolen v. Chater*, 80 F.3d 1273, 1279 (9th Cir. 1996) (citing *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985)).

The legal standard for rejecting the controverted findings of a claimant's treating physician requires "specific and legitimate reasons."  *Murray v. Heckler*, 722 F.2d 499, 502 (9th Cir. 1983). The legal standard for rejecting a claimant's testimony about her subjective symptoms as not credible requires "specific, clear and convincing" reasons.  *Garrison v. Colvin*, 759 F.3d 995, 1014–15 (9th Cir. 2014).  The legal standard for relying on a vocational expert's testimony when it conflicts with the *DOT* is "persuasive evidence to support the deviation."  *Johnson v. Shalala*, 60 F.3d 1428, 1435 (9th Cir. 1995).  If the ALJ failed to meet these standards, the court may find legal error.  *See Benitez*, 573 F.2d at 655.

Although the Court may "review only the reasons provided by the ALJ in the disability determination and may not affirm the ALJ on a ground upon which [the ALJ] did not rely,"

*Garrison*, 759 F.3 at 1010, "harmless error analysis applies in the social security context." *Marsh v. Colvin*, 792 F.3d 1170, 1173 (9th Cir. 2015). "[W]here the circumstances of the case show a substantial likelihood of prejudice, remand is appropriate so that the agency can decide whether reconsideration is necessary. By contrast, where harmlessness is clear and not a borderline question, remand is not appropriate." *McLeod v. Astrue*, 640 F.3d 881, 888 (9th Cir. 2011) (footnotes, citations, and internal quotation marks omitted). If the Court identifies defects in the administrative proceeding or the ALJ's conclusions, the Court may remand for further proceedings or for a calculation of benefits. *See Garrison*, 759 F.3d 1019–21.

### B. The ALJ Erred in Dismissing the Opinion of Saccomano's Treating Physician

Saccomano argues that the ALJ dismissed the opinion of Dr. Li, her treating physician, without providing specific and legitimate reasons for doing so, thus committing legal error. The Court agrees.

"Cases in this circuit distinguish among the opinions of three types of physicians: (1) those who treat the claimant (treating physicians); (2) those who examine but do not treat the claimant (examining physicians); and (3) those who neither examine nor treat the claimant (nonexamining physicians)." *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995).[6] The Ninth Circuit "afford[s] greater weight to a treating physician's opinion because 'he is employed to cure and has a greater opportunity to know and observe the patient as an individual.'" *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989) (quoting *Sprague v. Bowen*, 812 F.2d 1226, 1230 (9th Cir. 1987)). When, as here, the treating physician's opinion is contradicted by other opinions in the record, the ALJ must provide specific and legitimate reasons supported by substantial evidence before discounting that opinion. *Murray*, 722 F.2d at 502 (9th Cir. 1983).

In this case, the ALJ gave "little to no weight" to the opinion of Dr. Li, Saccomano's treating physician, stating that:

---

[6] The regulations governing treatment of medical evidence have been amended with respect to applications filed on or after March 27, 2017. *Compare* 20 C.F.R. § 404.1527 *with* 20 C.F.R. § 404.1520c. Because Saccomano filed her application before that date, the older framework applies here, and this order need not consider what effect the regulatory change has on Ninth Circuit precedent regarding the weight afforded to different categories of medical opinions.

> [t]here is no reasonable basis to support Dr. Li's broad limitations as
> to the claimant's being unable to sit, stand, or walk a total of six hours
> in an eight-hour day, missed days, and the need for hourly breaks.
> Concentration and attention deficits are also unsupported as well as
> the significant limitations regarding handing,[7] fingering, and feeling.

AR at 27. Here, because Dr. Li's opinions are partially contradicted by the assessment of

consultative examining physician Dr. Pon and the state examiners Dr. Nordlicht and Dr. Saphir,

*see id* at 25–27, the ALJ is required to have given specific and legitimate reasons for relying on

Dr. Pon's report instead. His reasons are specific, but they are not legitimate. Therefore, the ALJ

has erred as a matter of law by failing to properly weigh the opinion of Saccomano's treating

physician.

### 1. Dr. Li's Conclusions Regarding Motor Skill Limitations

The ALJ opined that the limitations that Dr. Li noted regarding reaching, handling, and

fingering were unsupported by the record, particularly because Dr. Pon had different findings. AR

at 26. However, the record contains several instances where doctors assessed Saccomano as

having C6 radiculopathy, which causes finger and thumb numbness leading to the limitations Dr.

Li described. Not only did Dr. Li consistently mention C6 radiculopathy, but Dr. Massih did as

well. *Id*. at 390. Dr. Pon also noted C6 radiculopathy and admitted that "there may be some

symptomatic limitations" regarding gross and fine manipulative tasks using the right hand, which

is consistent with Dr. Li's medical source statement. *Id*. at 391.

The ALJ and the Commissioner make much of the fact that "on the same day Dr. Li

completed his April 2014 opinion, his actual treatment records noted only restrictions as to lifting,

climbing, and prolonged sitting." *Id*. at 27 (*citing id*. at 372). The Ninth Circuit has recognized,

however, that "[t]he primary function of medical records is to promote communication and

recordkeeping for health care personnel—not to provide evidence for disability determinations.

[The Ninth Circuit] therefore [does] not require that a medical condition be mentioned in every

report to conclude that a physician's opinion is supported by the record." *Orn v. Astrue*, 495 F.3d

625, 634 (9th Cir. 2007). When, as here, "the record contains numerous reports from [the

---

[7] Dr. Li reported a limitation on "handling," not "handing." This minor discrepancy is likely a scrivener's error.

claimant's] health care providers, as well as results from medical tests and laboratory findings, that support the questionnaires completed by [the treating physicians]," it is erroneous to focus on a single day of treatment notes, particularly when the treatment records as a whole support a different conclusion. *Id.* The ALJ in this case mischaracterized Dr. Li's opinion and drew an illegitimate inference from his medical source statement. This reason for the ALJ's finding was not legitimate and constitutes reversible legal error.

### 2. Dr. Li's Purported Failure to Record Saccomano's Improvement

The ALJ asserted that "Dr. Li's findings on physical examinations remained grossly unchanged with intervening specialist examinations showing contradictive findings and greater functional abilities." *Id.* at 27. The record does not support this conclusion. Dr. Li's findings in the November 2016 medical source statement indicate improvement from his observations in 2014 in her lifting and concentration. *Compare id.* at 312–16 (stating Saccomano could "rarely" lift less than ten pounds, "never" lift ten pounds or more, and that her concentration would "constantly" be impaired) *with id.* at 981–83 (stating Saccomano could "occasionally" lift less than ten pounds, "rarely" lift ten pounds, and that her concentration would "occasionally" be impaired).

More importantly, as a matter of law, a "finding that a treating source's medical opinion is not entitled to controlling weight [because it is contradicted] does not mean that the opinion is rejected." Social Security Ruling (SSR) 96-2p at 1. Ninth Circuit law is clear:

> To say that medical opinions . . . are contrary to the preponderant conclusions mandated by the objective findings does not achieve the level of specificity our prior cases have required, even when the objective factors are listed seriatim. The ALJ must do more than offer his conclusions. He must set forth his own interpretations and explain why they, rather than the doctors', are correct.

*Embrey v. Bowen*, 849 F.2d 418, 421–22 (9th Cir. 1988) (footnote omitted). The ALJ did not make sufficiently specific interpretations of Dr. Li's findings. Therefore, contradictions between Dr. Li's opinions and other examining physicians' opinions are not in themselves specific and legitimate reasons to reject Dr. Li's conclusions.

### C.    The ALJ Erred in Finding Saccomano's Testimony Not Credible

Saccomano submits that the ALJ committed legal error by failing to credit her testimony

about her subjective pain without identifying clear and convincing reasons for his disbelief. "The ALJ is responsible for determining credibility and resolving conflicts in medical testimony." *Magallanes*, 881 F.2d at 750 (*citing Allen v. Heckler*, 749 F.2d 577, 579 (9th Cir. 1984)). When there is no finding of malingering, however, the ALJ must provide "specific, clear and convincing reasons" for finding a claimant's testimony not credible. *Garrison*, 759 F.3d at 1014–15. "General findings are insufficient." *Reddick v. Chater*, 157 F.3d 715, 722 (9th Cir.1998) (internal quotation marks omitted).

The ALJ advanced the following reasons for finding Saccomano's testimony not credible: "Overall, the claimant's daily activities combined with the minimal objective findings, conservative treatment course, and her doctor's recommendation of 'staying active' and exercising is consistent with the finding that the claimant can perform light work." *Id*. at 26. It is not enough to list reasons; the reasons must be clear and convincing. Here, the ALJ fell short of this standard.

The ALJ is responsible for determining the claimant's credibility. *Magallanes*, 881 F.2d at 750. The Ninth Circuit has articulated a two-part test for weighing a claimant's testimony regarding her subjective symptoms:

> To determine whether a claimant's testimony regarding subjective pain or symptoms is credible, an ALJ must engage in a two-step analysis. First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment "which could reasonably be expected to produce the pain or other symptoms alleged." *Bunnell v. Sullivan*, 947 F.2d 341, 344 (9th Cir. 1991) (en banc) (internal quotation marks omitted). The claimant, however, "need not show that her impairment could reasonably be expected to cause the severity of the symptom she has alleged; she need only show that it could reasonably have caused some degree of the symptom." *Smolen v. Chater*, 80 F.3d 1273, 1282 (9th Cir. 1996). "Thus, the ALJ may not reject subjective symptom testimony . . . simply because there is no showing that the impairment can reasonably produce the degree of symptom alleged." *Id*.; *see also Reddick*, 157 F.3d at 722 ("[T]he Commissioner may not discredit the claimant's testimony as to the severity of symptoms merely because they are unsupported by objective medical evidence.").
>
> Second, if the claimant meets this first test, and there is no evidence of malingering, "the ALJ can reject the claimant's testimony about the severity of her symptoms only by offering specific, clear and convincing reasons for doing so." *Smolen*, 80 F.3d at 1281; *see also Robbins* [*v. Soc. Sec. Admin.*, 466 F.3d 880, 883 (9th Cir. 2006)] ("[U]nless an ALJ makes a finding of malingering based on affirmative evidence thereof, he or she may only find an applicant not

credible by making specific findings as to credibility and stating clear and convincing reasons for each.").

*Lingenfelter v. Astrue*, 504 F.3d 1028, 1036 (9th Cir. 2007).[8]

The ALJ acknowledged that Saccomano's "medically determinable impairments could reasonably be expected to cause the alleged symptoms." AR at 22. The Court must now determine whether the ALJ articulated clear and convincing reasons for finding that "the information provided by the claimant generally may not be entirely reliable." *Id*. at 26. None of the ALJ's reasons pass that test.

### 1. Transferring Saccomano's Reported Daily Activities to the Workplaces

The ALJ's first reason—that Saccomano's daily activities led him to believe she was embellishing her symptoms—is not clear and convincing for two reasons. First, as a matter of Ninth Circuit law, "daily activities may be grounds for an adverse credibility finding 'if a claimant is able to spend a substantial part of his day engaged in pursuits involving the performance of physical functions that are transferable to a work setting.'" *Orn*, 495 F.3d at 639 (*citing Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989)). The Ninth Circuit has "repeatedly warned that ALJs must be especially cautious in concluding that daily activities are inconsistent with testimony about pain, because impairments that would unquestionably preclude work and all the pressures of a workplace environment will often be consistent with doing more than merely resting in bed all day." *Garrison*, 759 F.3d at 1016; *see also Vertigan v. Halter*, 260 F.3d 1044, 1049–50 (9th Cir. 2001) ("[T]he mere fact that a plaintiff has carried on certain daily activities, such as grocery shopping, driving a car, or limited walking for exercise, does not in any way detract from her credibility as to her overall disability."). Further, the ALJ offered no evidence to support his assertion that Saccomano's "doctor's recommendation of 'staying active' and exercising is consistent with the finding that the claimant can perform light work." AR at 26. This conclusion alone, unsupported, is insufficient to meet the "clear and convincing" standard.

The ALJ did not find that Saccomano's allegedly inconsistent daily activities are

---

[8] The Commissioner objects to the Ninth Circuit's "clear and convincing reasons" standard for the record to preserve the issue for appeal but acknowledges that this Court is bound by it. Comm'r's Mot. at 11 n.3.

transferable to the workplace or offer convincing evidence that her report of daily activities conflicted with her report of her symptoms; therefore, the ALJ committed a legal error when he found Saccomano's testimony not credible based on her daily reported activities.

### 2. Saccomano's Pain Testimony and Her Daily Activity Testimony

Secondly, Saccomano's testimony about her daily activities is not inconsistent with her subjective pain testimony. The ALJ opined that Saccomano's reports of restorative yoga and dog walking were evidence that her testimony about her physical limitations were "overstated." AR at 26. A closer look at Saccomano's testimony at the hearing, however, reveals no inconsistency between what Saccomano does each day and what she says her disability prevents her from doing. The ALJ's opinion makes these activities out to be more frequent and strenuous than is supported by substantial evidence. For example, Saccomano's testimony was that she walked the dogs three times weekly (requiring rest afterwards) and went to restorative yoga four times weekly. *Id*. at 48. These activities are not daily occurrences. The same is true for going out to lunch; Saccomano testified that this was something she "maybe" did, *id*. at 52, suggesting that it is not a daily routine as the ALJ implies.

The ALJ's opinion similarly mischaracterized Saccomano's yoga class. *Id*. at 26. The class is not recreational. Saccomano testified that the restorative yoga class is a therapeutic substitute for physical therapy and consists of "a gentle long stretch." *Id*. at 46–48. Stretching does not demonstrate an ability to work, and there is no basis to punish Saccomano for complying with her doctor's treatment recommendations, particularly given that failure to adhere to treatment weighs negatively on a claimant's credibility. See 20 C.F.R. §§ 404.1530, 416.930 (requiring the claimant to follow her course of prescribed treatment to receive benefits).

The ALJ also cited Saccomano's testimony about "doing household chores," such as cooking, doing the dishes, grocery shopping, and weekly light vacuuming, as inconsistent with her pain testimony. *Id*. at 26. However, Saccomano undertakes these activities in ways designed to accommodate her chronic pain. She limits herself to "small amounts [of dishes] at a time." *Id*. at 50. While cooking, she cannot lift anything as heavy as a gallon of milk. *Id*. at 54. She only vacuums one room at a time for a maximum of ten minutes and must rest for fifteen to twenty

minutes afterwards. *Id*. at 50–51. Saccomano's testimony that she needs frequent rest and must modify the length and intensity of her activities is consistent with her subjective pain testimony and the rest of the record when properly credited.

Finally, the ALJ points to Saccomano's driving as evidence that her testimony about both her pain and the side effects of her medications (drowsiness and difficulty concentrating) is not credible. *Id*. at 25–26. Saccomano only drives to places near her home, spending a total of twenty minutes per trip in the car. *Id*. at 52. This is not inconsistent with her statement that she avoids driving and other activities that require her to focus because of the side effects of her medication. The record does not support this reason for rejecting Saccomano's testimony.

### 3. Lack of Objective Medical Evidence

The ALJ's third reason—that a lack of objective findings led him to discredit Saccomano's testimony—is unconvincing as a matter of law. The Ninth Circuit and the Social Security Administration have made clear that "the Commissioner may not discredit the claimant's testimony as to the severity of symptoms merely because they are unsupported by objective medical evidence." *Reddick*, 157 F.3d at 722. *See also* 20 C.F.R. § 404.1529(c)(2) (assuring the claimant that an ALJ "will not reject your statements about the intensity and persistence of your pain or other symptoms or about the effect your symptoms have on your ability to work solely because the available objective medical evidence does not substantiate your statements."). The Ninth Circuit has further specified that "an ALJ does not provide specific, clear, and convincing reasons for rejecting a claimant's testimony by simply reciting the medical evidence in support of his or her residual functional capacity determination . . . . [The ALJ must] provide clear and convincing reasons, supported by evidence in the record, to support that credibility determination." *Brown-Hunter v. Colvin*, 806 F.3d 487, 489 (9th Cir. 2015). Lack of objective evidence alone is not a clear and convincing reason, and the ALJ did not provide any additional reasoning beyond the lack of objective medical documentation. Therefore, a credibility determination made on these grounds is unconvincing as a matter of law

### 4. Diagnostic Imaging and Conservative Treatment

Finally, the ALJ opined that Saccomano's "[d]iagnostic imaging has been relatively

benign." *Id*. at 23. He points to the lack of surgery and "minimal" findings on the x-ray and MRI as evidence of Saccomano's lack of credibility. *Id*. at 23–24. The record tells a different story. The May 2013 x-ray noted anterolisthesis, degenerative spondylolisthesis, flattening of the mid to lower cervical curve, facet arthritis, and degenerative disk disease. *Id*. at 269. The 2014 MRI found "mild degenerative change of the acromioclavicular joint," *id*. at 311; this is consistent with the 2009 MRI, which led Dr. Flapan to diagnose possible chronic thoracic outlet syndrome and cervicalgia in 2013. *Id*. at 284–85. Dr. Massih noted that the 2014 EMG showed "definatly [sic] impingement." *Id*. at 974.

To support his reasoning, the ALJ selectively discusses Dr. Rustnazadeh's findings. *Id*. at 23. While it is accurate that Dr. Rustanazadeh "cannot explain" the EMG findings of C6 radiculopathy, his conclusion was that "most likely, [Saccomano] has shoulder arthropathy." *Id*. at 298. The ALJ was also technically correct that Dr. Vaughn's reading of the diagnostic imaging yielded "no clear evidence of isolated C6 nerve root impingement." *Id*. at 26 (*citing id*. at 305). However, Dr. Vaughn went on to say, "I do not feel that her shoulder is the source of her pain" and suggested that "a variant of thoracic outlet syndrome" could be the cause. *Id*. at 305. These two physician opinions do not contradict the severity of Saccomano's pain. Rather, they disagree as to its cause. Accordingly, it is not convincing for the ALJ to advance their opinions to discredit Saccomano's pain testimony.

The ALJ also pointed to the fact that Saccomano did not need surgery to support his conclusion that she was exaggerating her symptoms. However, the ALJ overlooked (or perhaps discredited without sufficient reason) Dr. Li's treatment note that surgery "might be indicated but carries much higher risks and financial burden." *Id*. at 336. This is particularly relevant given the adverse reaction Saccomano had to her hysterectomy in 2014. *See id*. at 518–19 ("Intraoperatively, the patient has a significant vasovagal episode with profound bradycardia and hypertension . . . . It was felt that the patient likely developed Takotsubo Syndrome and will make a full recovery."); *see also* Pl's Mot. (dkt. 20) at 7 n.2 (discussing a source explaining that Takotsubo syndrome can be a reaction to surgery.). The ALJ did not address any of these issues; his assertion that the lack of surgical intervention calls into question Saccomano's credibility is

therefore not clear and convincing.

Finally, the ALJ asserts that Saccomano's treatment was "conservative" and that her symptoms were solved with medication. Neither of these assertions is supported by the record. First, Dr. Li did not consider epidural injections "conservative" treatment, but instead prescribed the injections because "conservative treatment had failed." AR at 341. In addition, the ALJ offers no justification for classifying epidural shots, which are administered by a surgeon and require conscious sedation, as "conservative." *See Garrison*, 759 F.3d at 1015 n.20 ("[W]e doubt that epidural steroid shots to the neck and lower back qualify as 'conservative medical treatment.'"). Finally, Saccomano did not claim that medication fully alleviates her pain, only that it reduces it, and further testified that the medication causes significant side effects. AR at 56 (Saccomano's testimony that medication reduces the pain from "eight to ten" to "about a four or a five," and that it causes "dizziness, drowsiness, and limited concentration"). The record does not support the ALJ's final reason, and it is therefore not convincing.

None of the ALJ's reasons for dismissing Saccomano's testimony as not credible are clear and convincing. The ALJ committed a reversible legal error in failing to credit Saccomano's testimony about her subjective pain symptoms.

### D. The ALJ Erred in His Step Five Analysis

Finally, Saccomano argues that the ALJ's determination that she could perform light work—specifically as a small products assembler, production assembler, or bench assembler—was legal error because the ALJ relied on vocational expert testimony that conflicted with the DOT without persuasive evidence, and because the ALJ's hypotheticals were defective. The Court agrees.

#### 1. Conflict Between Vocational Expert Testimony and the DOT

At the November 17, 2013 hearing, the ALJ heard testimony from vocational expert Ronald Morrell that the three jobs he referenced required only "occasional" reaching and were therefore appropriate substantial gainful employment for Saccomano given the ALJ's determination of her RFC. AR at 63. This assessment, he admitted, was contrary to the DOT and SCO descriptions of the job: the SCO lists the reaching requirement as "constant" for small

25

products assembler and "frequent" for production and bench assemblers. AR 66–67; *see also* SCO at 281 (production assembler), 282 (bench assembler), and 285 (small products assembler). In situations like this, "an ALJ may rely on expert testimony which contradicts the DOT, but only insofar as the record contains persuasive evidence to support the deviation." *Johnson*, 60 F.3d at 1435.

The vocational expert testified that he based his deviation from the DOT and SCO on his personal observations of the jobs being performed. AR at 67. He testified that he had not seen the jobs done in three or four years. *Id*. He further testified that he had not prepared any reports about the jobs or the discrepancy between what he had seen and what was reported in the DOT. *Id*. Other than noting that his observations occurred several years earlier, the vocational expert did not discuss the extent to which he had observed these jobs being performed or address whether his observations were sufficient to reach a conclusion as to the entire category of jobs. *See id.* at 66–68. The ALJ did not inquire further as to the basis for the vocational expert's opinion. An unrecorded and unexamined or explained past recollection from years ago is not persuasive evidence to support a deviation from the DOT and the SCO. Because the vocational expert's deviation from the DOT and the SCO regarding the amount of reaching required by the jobs he set forth is not supported by persuasive evidence in the record, the ALJ erred in relying on his testimony.

### 2. Incomplete Hypotheticals

Saccomano further argues that the vocational expert's opinion is of "no evidentiary value" because the ALJ failed to include all Saccomano's limitations in the hypotheticals he posed to the vocational expert. Hypotheticals "must include 'all of the claimant's functional limitations, both physical and mental' supported by the record." *Thomas v. Barnhart*, 278 F.3d 947, 956 (9th Cir. 2002) (quoting *Flores v. Shalala*, 49 F.3d 562, 570–71 (9th Cir. 1995)). Saccomano testified about her "drowsiness, dizziness, and limited concentration." AR at 56–58. In addition, Dr. Li, whose opinion the ALJ improperly discredited, opined that Saccomano would miss more than four days of work each month and that she would need unscheduled breaks of five to ten minutes hourly. *Id*. at 982–83. He also indicated that she would have trouble with handling, fingering, and

feeling. *Id*. at 983. The ALJ's two hypotheticals, however, did not mention these limitations. *See id*. at 61, 65.

While the ALJ "need not include all claimed impairments in his hypotheticals, he must make specific findings explaining his rationale for disbelieving any of the claimant's subjective complaints not included in the hypothetical." *Light v. Soc. Sec. Admin.*, 119 F.3d 789, 793 (9th Cir. 1997). The ALJ did not make a specific finding explaining his rationale for not including Saccomano's limitations with respect to time off-task, missed work days, and manipulation limits in his hypotheticals. He did not specifically address the medication side effects of drowsiness, dizziness, and lack of concentration, or Dr. Li's opinion as stated in his 2016 medical source statement beyond discussing his general lack of trust in both sources; as discussed above, his reasons for discrediting those sources were not sufficient. The ALJ therefore erred in failing to include Saccomano's limitations regarding being off-task at work, missing work, and having difficulty with manipulative tasks in his hypotheticals to the vocational expert.

Ninth Circuit precedent dictates that this error is not harmless:

> [A]n ALJ is not free to disregard properly supported limitations . . . . Such a failure [to include a claimant's validly determined limitations] cannot be deemed harmless because, if the ignored testimony is credited, a proper hypothetical would have included limitations which, the record suggests, would have been determinative as to the vocational expert's recommendation to the ALJ.

*Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 886 (9th Cir. 2006). Here, the Court knows what the vocational expert's response would have been to a hypothetical including all Saccomano's limitations because Saccomano's attorney posed one. *Id*. at 68–69 (presenting additional hypotheticals, including one corresponding to Dr. Li's assessment of Saccomano's reaching, handling, and fingering limitations). The vocational expert's response is clear: "There'd be no jobs." *Id*. at 69. Based on that response, the Court can assume that "a proper hypothetical would have been determinative as to the vocational expert's recommendation," and concludes that the ALJ's error in relying on an incomplete hypothetical RFC was not harmless. *See Robbins*, 466 F.3d at 886.

### E.    Remand for Benefits Is Appropriate

The proper remedy for the ALJ's legal errors is for the Court to remand the case for an award of benefits. The Ninth Circuit follows the "credit as true" rule, a three-part test that allows the Court to remand to the ALJ to calculate and award benefits when: (1) "the ALJ failed to provide legally sufficient reasons for rejecting evidence, whether claimant testimony or medical opinion"; (2) "there are [no] outstanding issues that must be resolved before a disability determination can be made" and "further administrative proceedings would [not] be useful"; and (3) "on the record taken as a whole, there is no doubt as to disability." *Leon v. Berryhill*, 880 F.3d 1041, 1045 (9th Cir. 2017) (citations and internal quotation marks omitted); *see also Garrison*, 759 F.3d at 1021 (holding that a district court abused its discretion in declining to apply the "credit as true" rule to an appropriate case). The "credit-as-true" rule does not apply "when the record as a whole creates serious doubt as to whether the claimant is, in fact, disabled within the meaning of the Social Security Act," *Garrison*, 759 F.3d at 1021, when "there is a need to resolve conflicts and ambiguities," *Treichler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1101 (9th Cir. 2014), or when there is ambiguity about when the claimant's disability began that is not solved by the record credited as true. *See Dominguez v. Colvin*, 808 F.3d 403, 409 (9th Cir. 2015).

Here, as discussed above, the ALJ failed to provide legally sufficient reasons for rejecting Dr. Li's opinions and Saccomano's testimony. No outstanding issues must be resolved through further administrative proceedings, and nothing in the record raises serious doubt as to whether Saccomano is truly disabled. As in cases where the Ninth Circuit has held the "credit as true" rule to be appropriate, the physician who treated Saccomono "extensively"—Dr. Li—found consistently that she had disabling limitations, his "opinion was supported by other doctors' diagnoses, . . . a vocational expert addressed the physical limitations outlined by the physician and testified that the claimant was unable to do any full-time work," and the "administrative record [is] extensive and without inconsistencies in the claimant's *primary physician's* medical opinions." *See Leon*, 880 F.3d at 1047 (summarizing *Trevizo v. Berryhill*, 871 F.3d 664, 677, 683 (9th Cir. 2017)) (emphasis added). Also as in such cases, the ALJ rejecting Saccomano's testimony regarding subjective symptoms "because [the ALJ determined that] the pain was not as severe as

28

alleged, although the claimant's testimony as to her own limitations was not inconsistent with the medical opinions and observations in the record." *Id.* (summarizing *Trevizo*, 871 F.3d at 679–80). Although doctors who treated Saccomano differed in their opinions of what, exactly, caused her pain, none opined that her pain was not as severe as she testified. The Court concludes that the credit-as-true rule applies under these circumstances.

The Commissioner argues that, because "the RFC assessment contains no restrictions in reaching, either in direction or frequency, for the left upper extremity," remand for further hearings is appropriate to determine the capacity of her left arm and shoulder. Comm'r's Mot. (dkt. 24) at 17 (citing AR at 26). The issue of whether to treat DOT descriptions as unilateral or bilateral is not settled. *See Lamear v. Berryhill*, 865 F.3d 1201, 1206 n.4 (9th Cir. 2017) (acknowledging the differing opinions among the federal circuits). Regardless of Saccomano's restriction on reaching, however, her pain symptoms and the side effects of her medication are sufficient to render her disabled. Dr. Li opined that that Saccomano would miss more than four days of work per month, and the ALJ failed to provide legally sufficient reasons to reject that opinion. AR at 983. The vocation expert testified unambiguously that no job available to someone with Saccomano's other restrictions would permit her to miss more than two days per month "on a regular consistent basis." *Id.* at 69–70.

There are no outstanding issues remaining because, even if the Court were to remand for a determination regarding Saccomano's left hand, properly crediting her pain testimony and Dr. Li's assessment of her ability to attend work would compel an award of benefits independent of restrictions on reaching. Further proceedings with respect to this issue would be inappropriate and the matter is therefore REMANDED for an award of benefits. *See Garrison*, 759 F.3d at 1019–21.

## IV.    CONCLUSION

For the reasons discussed above, Saccomano's motion is GRANTED, the Commissioner's motion is DENIED, and the matter is REMANDED to the Commissioner for an award of benefits

/ / /

/ / /

consistent with this order.  The Clerk is instructed to enter a judgement accordingly and to close the file.

**IT IS SO ORDERED.**

Dated: September 30, 2019

_____
JOSEPH C. SPERO
Chief Magistrate Judge